# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KIMBERLY ESPARZA** | **CIVIL ACTION** |
| **VERSUS** | **No. 17-4803** |
| **UNIVERSITY MEDICAL CENTER** | |
| **MANAGEMENT CORPORATION ET AL.** | **SECTION I** |

## ORDER AND REASONS

Before the Court are two motions to dismiss. The first motion[1] to dismiss was filed by the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("the LSU Board"). The LSU Board argues that sovereign immunity bars the Court from hearing Esparza's claim against it under § 1557 of the Patient Protection and Affordable Care Act ("ACA"). As for Esparza's claims against the LSU Board under § 504 of the Rehabilitation Act of 1973, the LSU Board argues that Esparza has failed to state a claim upon which the Court can grant relief.

University Medical Center Management Corporation ("UMC")[2] and Louisiana Children's Medical Center ("LCMC") also filed a motion[3] to dismiss. They argue that Esparza's state law claims against them are premature and as such should be dismissed. They also argue that Esparza has failed to state claims for compensatory damages under § 1557 of the ACA and § 504 of the Rehabilitation Act. Finally, UMC

---

[1] R. Doc. No. 27.

[2] The first amended complaint, R. Doc. No. 17, misspells "Management" as "Mangement."

[3] R. Doc. No. 28.

and LCMC ask the Court to stay the case while Esparza submits her state law claims to the requisite state administrative process.

Esparza opposes[4] both motions. For the following reasons, the Court denies the motions.

## I.

Kimberly Esparza is a deaf individual whose primary mode of communication is American Sign Language ("ASL").[5] UMC operates University Medical Center New Orleans ("the hospital"), a full-service medical facility allegedly owned by the LSU Board.[6] LCMC is UMC's sole member.[7]

From October 2016 through March 2017, Esparza visited the hospital on a number of occasions to receive medical care, including treatment for a broken arm, dental treatment, and lab work.[8] During these visits, the hospital did not provide a qualified in-person sign language interpreter to assist Esparza in communicating with staff and learning healthcare-related information.[9] Instead, the hospital offered Esparza use of a Video Remote Interpreting ("VRI") machine.[10]

---

[4] R. Doc. No. 32; R. Doc. No. 33. After the Court ordered additional briefing on the sovereign immunity issues in the case, Esparza clarified that she opposes the LSU Board's motion to dismiss her § 1557 claim on sovereign immunity grounds. *See* R. Doc. No. 36.

[5] R. Doc. No. 17, ¶¶ 7, 20.

[6] *Id.* ¶¶ 8, 10. According to the complaint, the LSU Board "owns" the hospital and "contracts" with UMC to operate it. *Id.* ¶ 10.

[7] *Id.* ¶ 9.

[8] *See id.* ¶¶ 23, 30, 34, 36, 41, 45.

[9] *See id.* ¶¶ 23, 30, 34, 36, 41-44, 45-48.

[10] *Id.* ¶ 24. The complaint explains that VRI "is a videotelecommunication service that uses devices such as web cameras or videophones to provide sign language or

According to Esparza, the VRI machine—the only accommodation provided by the hospital—was "heavily pixilated."[11] Moreover, Esparza alleges that use of the VRI machine was not appropriate during certain visits, because she "had limited ability [to] sign with both hands" for a certain period of time "as a result of her injury" to her right arm.[12] The VRI machine also required "several hours to set up."[13]

As a result, Esparza contends that the VRI machine was an ineffective accommodation, and so she had to resort to written English, or the assistance of her mother or boyfriend to communicate with hospital staff. However, Esparza alleges that her proficiency in written English is "limited";[14] that her mother is not a qualified sign language interpreter;[15] that use of her mother as an interpreter required Esparza to relinquish her medical privacy and "embarrassed" her;[16] and that her boyfriend is also deaf, and he had to attempt to read the lips of hospital staff and then translate his reading of their lips into ASL.[17]

Esparza requested that the hospital provide her with a qualified in-person sign language interpreter.[18] However, the hospital refused to provide one, informing Esparza that it would not pay for the service.[19]

---

spoken language interpreting services through a remote or offsite interpreter." *Id.* ¶ 4.

[11] *Id.* ¶ 34.
[12] *Id.* ¶ 25.
[13] *Id.* ¶ 24.
[14] *Id.* ¶ 21.
[15] *Id.* ¶ 27.
[16] *Id.*
[17] *Id.* ¶ 30.
[18] *Id.* ¶¶ 34, 37.
[19] *Id.* ¶¶ 35, 37.

Because the hospital did not provide a qualified in-person sign language interpreter to assist her during her visits, Esparza alleges that she was not able to effectively communicate with hospital staff about the "nature, scope, or consequence" of her broken arm or dental treatment,[20] treatment options,[21] the use and side effects of medications,[22] lab work,[23] and women's health issues.[24] Esparza also alleges that she was not able to understand various medical documents.[25]

In response, Esparza filed the present case against UMC, LCMC, and the LSU Board. Esparza alleges that UMC and LCMC violated her rights under Title III of the Americans with Disabilities Act and the Louisiana Commission on Human Rights Act.[26] Esparza also alleges that all three defendants violated her rights under § 504 of the Rehabilitation Act and § 1557 of the ACA.[27]

## II.

### A.

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of an action where the court finds that it does not possess subject matter jurisdiction over the action. Where "a Rule 12(b)(1) motion is filed in conjunction with other Rule

---

[20] *Id.* ¶¶ 28, 31.

[21] *Id.* ¶¶ 28, 31.

[22] *Id.* ¶ 32.

[23] *Id.* ¶ 40.

[24] *Id.*

[25] *Id.* ¶¶ 41-43, 46-47.

[26] *Id.* ¶¶ 75, 87.

[27] *Id.* ¶¶ 97, 108. After inquiry by the Court as to whether sovereign immunity barred Esparza's claim against the LSU Board under Title II of the ADA, Esparza agreed to dismiss the Title II claim with prejudice and proceed against the LSU Board under the Rehabilitation Act and the ACA. *See* R. Doc. No. 34.

12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). Courts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Where the defendant has questioned the court's subject matter jurisdiction, the plaintiff has the burden of "proving by a preponderance of the evidence that the trial court does" possess the requisite jurisdiction to hear the case. *Patterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

## B.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court may dismiss a complaint, or any part of it, where a plaintiff has not set forth well-pleaded factual allegations that would entitle him to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A plaintiff's factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In other words, a complaint "must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)).

A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *bal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

On a Rule 12(b)(6) motion to dismiss, a court limits its review "to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *see also Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). In assessing the complaint, the Court must accept all well-pleaded factual allegations as true and liberally construe all such allegations in the light most favorable to the plaintiff. *Spivey*, 197 F.3d at 774; *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). Where "the complaint 'on its face show[s] a bar to relief,'" then dismissal is the appropriate course. *Cutrer v. McMillan*, 308 Fed. App'x. 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

### III.

### A.

The LSU Board first moves to dismiss Esparza's claim under § 1557 of the ACA for lack of subject matter jurisdiction, contending that sovereign immunity bars the Court from adjudicating Esparza's § 1557 claim against it.[28]  However, the LSU Board's position assumes that Esparza has the right to bring an individual claim under § 1557.  The Court will first address that question.

**i.**

Section 1557 of the ACA provides:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).  The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).  The ACA does not provide an express private right of action under § 1557.  As such, the Court must consider whether the ACA provides an *implied* one.

The existence of an implied private right of action is determined by reference to the four-factor test first articulated by the U.S. Supreme Court in *Cort v. Ash*, 422 U.S. 66 (1975):

---

[28] *See* R. Doc. No. 27-1, at 9-11.

7

(1) Is this plaintiff a member of the class for whose "especial" benefit the statute was passed? In other words, does the statute create a federal right for this plaintiff?

(2) Is there any evidence of legislative intent, either explicit or implicit, to create or deny a private remedy?

(3) Is it consistent with the legislative scheme to imply a private remedy?

(4) Is the cause of action one traditionally relegated to state law so that implying a federal right of action would be inappropriate?

*Lundeen v. Mineta*, 291 F.3d 300, 311 (5th Cir. 2002) (quoting *Louisiana Landmarks Society, Inc., v. City of New Orleans*, 85 F.3d 1119, 1122-23 (5th Cir. 1996)). When analyzing a federal statute under *Cort v. Ash*, a court should "begin with the familiar presumption that Congress did not intend to create a private right of action." *Louisiana Landmarks Society*, 85 F.3d at 1123 (internal quotation marks omitted). The plaintiff carries the burden of showing "that Congress affirmatively contemplated private enforcement when it passed the relevant statute." *Id.* (quoting *Victorian v. Miller*, 813 F.2d 718, 721 (5th Cir. 1987) (en banc)).

Other courts have concluded that § 1557 is indeed enforceable via an implied private right of action. *See Se. Penn. Trans. Auth. v. Gilead Sci., Inc.*, 102 F. Supp. 3d 688, 697-99 (E.D. Penn. 2015); *Rumble v. Fairview Health Serv.*, No. 14-2037, 2015 WL 1197415, at *7 n.3 (D. Minn. Mar. 16, 2015) (Nelson, J.); *Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 845-48 (D.S.C. 2015). Unsurprisingly, Esparza agrees with these courts.[29] UMC and LCMC likewise acknowledge that "the Court would not be remiss in recognizing an implied private right of action under § 1557" given

---

[29] *See* R. Doc. No. 32, at 10-11.

the lack of case law to the contrary.[30]  The LSU Board did not provide guidance as to this issue,[31] despite the Court's order to do so.[32]

Applying the *Cort v. Ash* test to § 1557, the Court agrees with its sister courts and concludes that § 1557 is enforceable via an implied private right of action. Section 1557 "expressly identifies" classes of individuals that "Congress intended to benefit"—namely, the individuals protected by the four federal nondiscrimination statutes explicitly referenced and incorporated.  *Lundeen*, 291 F.3d at 311 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 690 (1979)); *see also Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 671 (N.D. Tex. 2016).  Section 1557 also mirrors the rights-creating language used in those statutes.  *Se. Penn. Trans. Auth.*, 102 F. Supp. 3d at 698; *Callum*, 137 F. Supp. 3d at 847.  "The cross-reference to these statutes and the use of similar rights-creating terms manifest Congressional intent to create a private right."  *Se. Penn. Trans. Auth.*, 102 F. Supp. 3d at 698.

Further, subsection (a) of § 1557 provides that the "enforcement mechanisms provided for and available under" the other four statutes "shall apply for purposes of violations of" § 1557.  Those statutes all permit private rights of action.  *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001) (noting that Title VI and Title IX provided private rights of action); *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (noting that § 504 is enforceable through an implied private right of action); *Parker v. Bd. of Super. Univ. of La.-Lafayette*, 296 Fed. App'x 414, 417 (5th Cir. 2008)

---

[30] *See* R. Doc. No. 28-1, at 20.
[31] *See* R. Doc. No. 27.
[32] *See* R. Doc. No. 25.

(treating the Age Discrimination Act as providing a private right of action and specifying the statutory prerequisites to bringing a claim under it). As one court observed, "[b]ecause Section 1557 states that the enforcement mechanisms available under those four statutes apply to violations of Section 1557, Section 1557 necessarily also permits private causes of action." *Rumble*, 2015 WL 1197415, at *7 n.3; *cf. Se. Penn. Trans. Auth.*, 102 F. Supp. 3d at 698 ("[S]uch express incorporation of the enforcement mechanisms from those statutes is probative of Congressional intent to provide both a private right and a private remedy for violations of Section 1557.").

Recognition of an implied private right of action to enforce § 1557 then is not merely "consistent with the legislative scheme," *Lundeen*, 291 F.3d at 311, but it is in fact explicitly contemplated by the scheme. Moreover, as the recognition of an implied private right of action to enforce § 504 illustrates well, *see Frame*, 657 F.3d at 223, a right of action to enforce a federal nondiscrimination provision does not unduly step on the toes of state law.

It seems abundantly clear to the Court that Congress intended to create a private right of action to enforce § 1557—and congressional intent is the "touchstone" of the *Cort v. Ash* analysis. *Lundeen*, 291 F.3d at 312 (quoting *Louisiana Landmarks Soc'y*, 85 F.3d at 1123). Section 1557 is enforceable via an implied private right of action. With that question settled, the Court can now address whether sovereign immunity bars an individual, such as Esparza, from asserting a § 1557 claim against the LSU Board in federal court.

**ii.**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  Despite the Eleventh Amendment's language targeting Article III diversity jurisdiction, the U.S. Supreme Court has fashioned a doctrine of Eleventh Amendment sovereign immunity defined by reference to "the Constitution's structure, its history, and the authoritative interpretations by this Court." *Alden v. Maine*, 527 U.S. 706, 713 (1999); *see also Hans v. Louisiana*, 134 U.S. 1, 13 (1890); *cf. Meyers ex rel. Benzing v. Tex.*, 410 F.3d 236, 240-41 (5th Cir. 2005) ("'Eleventh Amendment immunity' is a misnomer, . . . because that immunity is really an aspect of the Supreme Court's concept of state sovereign immunity and is neither derived from nor limited by the Eleventh Amendment.").

Sovereign immunity operates as "a constitutional limitation on the federal judicial power." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). However, unlike other aspects of the federal courts' subject matter jurisdiction, sovereign immunity is waivable: "a State may consent to suit against it in federal court." *Id.* at 99.  To effectuate waiver, "the State's consent [must] be unequivocally expressed." *Id.*  A court "will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.'" *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)).  For example,

"[t]he mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts." *Id.*

In addition, Congress may abrogate a state's sovereign immunity when exercising at least some of its constitutional powers. *See Fitzpatrick v. Bitker*, 427 U.S. 445, 456 (1976) (holding that Congress has the power to abrogate state sovereign immunity under section 5 of the Fourteenth Amendment); *but see Seminole Tribe of Fla. V. Fla.*, 517 U.S. 44, 72 (1996) (holding that Congress does not have the power to abrogate state sovereign immunity under the Indian Commerce Clause). However, as with a state's voluntary waiver of sovereign immunity, abrogation requires "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Pennhurst*, 465 U.S. at 99; *see also Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 243 (1985) ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment."), *superseded by* An Act to Extend and Improve the Rehabilitation Act of 1973, Pub. L. 99-506, 100 Stat. 1807 (1986). "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Id.* at 246. "When Congress chooses to subject the States to federal jurisdiction, it must do so specifically." *Id.*

Besides waiver and abrogation, the U.S. Supreme Court has also recognized—as a means "to promote the vindication of federal rights," *Pennhurst*, 465 U.S. at 105—that an individual may bring certain kinds of federal claims directly against state officers in their individual capacities and avoid running up against the sovereign immunity bar. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Edelman*, 415 U.S. at 676 (limiting *Ex parte Young* actions to claims seeking prospective injunctive relief); *Seminole Tribe*, 517 U.S. at 75-76 (concluding *Ex parte Young* actions are not available where Congress has established a remedial scheme to settle a particular claim, even if that scheme is inoperable). However, the Fifth Circuit has concluded that "the LSU Board is an arm of the state and is immune from suit under the Eleventh Amendment." *Raj v. La. St. Univ.*, 714 F.3d 322, 328 (5th Cir. 2013). Unless Congress has validly abrogated Louisiana's sovereign immunity with respect to § 1557 claims or Louisiana has unambiguously waived its sovereign immunity with respect to § 1557 claims, plaintiff cannot assert such claims against the LSU Board in this Court. *See Pennhurst*, 465 U.S. at 98.

### iii.

As the Court previously explained, § 1557 provides that "an individual shall not, on the ground prohibited under [certain federal laws], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, *any part of which is receiving Federal financial assistance*, including credits, subsidies, or contracts of insurance." 42 U.S.C. §

18116(a) (emphasis added).[33]  No provision of the ACA purports to abrogate state sovereign immunity.  Moreover, as a general matter, "Louisiana has expressly declined to waive its sovereign immunity under the Eleventh Amendment." *Raj*, 714 F.3d at 328 (citing La. R.S. § 13:5106(A) and *Richardson v. S. Univ.*, 118 F.3d 450, 453 (5th Cir. 1997)).

However, Title 42, United States Code, § 2000d-7 provides that:

A State *shall not be immune* under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794], title IX of the Education Amendments of 1972 [20 U.S.C.A. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C.A. § 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], *or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.*

42 U.S.C. § 2000d-7(a)(1) (emphasis added).  With § 2000d-7, Congress struck a bargain with the states: if a federal statute prohibits discrimination on a certain basis by recipients of federal money, then a state entity that receives federal money is subject to suit in federal court for violations of that nondiscrimination provision.

This case is far from the first in this Circuit to consider § 2000d-7.  The Fifth Circuit comprehensively addressed § 2000d-7's validity in *Pace v. Bogalusa City School Bd.*, 403 F.3d 272 (5th Cir. 2005) (en banc), which involved analyzing the impact of § 2000d-7 on claims brought under § 504 and the Individuals with Disabilities Education Act.  Remarkably, the LSU Board does not even cite *Pace*—let alone discuss its holding and reasoning—in a supplemental brief that this Court

---

[33] For definitions, see 45 C.F.R. § 92.4 (eff. July 18, 2016).

ordered specifically respecting the applicability of § 2000d-7 to § 1557.[34] Such a significant oversight on the part of the LSU Board cannot help but call into question the rigor with which the LSU Board considered the issue.

As the Fifth Circuit explained in *Pace*, "congressional spending programs that are enacted in pursuit of the general welfare and unambiguously condition a state's acceptance of federal funds on reasonably related requirements are constitutional unless they are either (1) independently prohibited or (2) coercive." 403 F.3d at 279 (analyzing *South Dakota v. Dole*, 483 U.S. 203 (1987)). "When the condition requires a state to waive its Eleventh Amendment immunity, . . . an unambiguous statement of the condition and its proscription on coercive inducements serve a dual role because they ensure . . . that waiver of Eleventh Amendment immunity must be (a) knowing and (b) voluntary." *Id.*

According to the *Pace* court, § 2000d-7 adequately put Louisiana "on notice that, by accepting federal money, it was waiving its Eleventh Amendment immunity." *Id.* at 284. Moreover, § 2000d-7 is not unconstitutionally coercive, as a state entity can simply decline federal money if it wants to avoid being hauled into federal court by an individual alleging that the state entity violated a covered federal nondiscrimination law. *See id.* at 287. Based on these considerations, the Fifth Circuit held that "the waiver condition set forth in § 2000d-7 is a constitutionally permissible exercise of Congress' spending power." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 453 (5th Cir. 2005) (discussing *Pace*, 403 F.3d at 280-87).

---

[34] *See* R. Doc. No. 35.

## iv.

The holding and reasoning in *Pace* governs the outcome of the Court's § 1557 sovereign immunity analysis. In addition to the four federal nondiscrimination statutes that are explicitly referenced—the same four referenced in and incorporated into § 1557—§ 2000d-7 applies to "provisions of . . . Federal statute[s] prohibiting discrimination by recipients of Federal financial assistance." Section 1557 is a federal nondiscrimination provision, the applicability of which turns on being a "health program or activity" that "receiv[es] Federal financial assistance." *Cf.* 29 U.S.C. § 794(a) (codifying § 504 of the Rehabilitation Act of 1973, which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"). If a state entity meets § 1557's requirements, then—pursuant to the terms of § 2000d-7—that entity has waived its immunity against individual § 1557 claims in federal court. *Cf. Pace*, 403 F.3d at 285-87 (holding that Louisiana, as a recipient of federal funds, knowingly and voluntarily waived its sovereign immunity with respect to § 504 claims under the terms of § 2000d-7); *Bennett-Nelson*, 431 F.3d at 453 (concluding that Louisiana Tech University was "an intended recipient of federal financial assistance" and so falls within § 504 and § 2000d-7, because the University ultimately benefited from federal student financial aid in the form of tuition payments and other expenses).

In its supplemental brief addressing § 2000d-7's impact on the § 1557 sovereign immunity question—which, again, does not acknowledge *Pace*—the LSU Board argues that "the ultimate aim of Congress under Section 1557 was to the 'health program or activity' and not to the 'recipient of Federal financial assistance.'"[35]  To support this argument, the LSU Board points to *McGarry v. Univ. of Miss. Med. Ctr.*, 355 Fed. App'x 853 (5th Cir. 2009),[36] which itself points to another Fifth Circuit panel decision that concluded that "[t]he [Age Discrimination in Employment Act (ADEA)] prohibits age discrimination by 'employers,' not by those who receive federal financial assistance."  355 Fed. App'x at 856 (quoting *Sullivan v. Univ. of Tex. Health Sci. Ctr. at Houston Dental Branch*, 217 Fed. App'x 391, 395 (5th Cir. 2007)).

For starters, *McGarry*'s discussion of the ADEA nondiscrimination provision is irrelevant to the Court's § 1557 sovereign immunity analysis.  The ADEA provision does not target recipients of federal financial assistance, but rather targets employers.

---

[35] *Id.* at 5.

[36] The LSU Board also points to an out-of-circuit case, *Levy v. Kan. Dep't of Social and Rehab. Serv.*, 789 F.3d 1164 (10th Cir. 2015).  Not only is this case not binding on the Court, but it also does not bolster the LSU Board's position.  In *Levy*, the Tenth Circuit concluded that "the close relationship between [the Rehabilitation Act and the Americans with Disabilities Act (ADA)] is not sufficient to conclude that the Rehabilitation Act's waiver provisions apply by implication to the ADA."  789 F.3d at 1170.  The *Levy* court explained that, "[i]n the absence of clear evidence that Congress intended for states to waive their immunity under the ADA by accepting federal funds, we will not stretch the language of the Rehabilitation Act to conclude that [a state entity] has made a clear and voluntary waiver of its sovereign immunity for ADA claims."  *Id.* at 1171.

In this case, the Court has clear evidence of Congress's intent that § 2000d-7 would apply to § 1557: Congress explicitly conditioned applicability of § 1557 on the receipt of federal funds, *see* 42 U.S.C. § 18116(a), just as Congress did with § 504, *see* 29 U.S.C. § 794(a).  Therefore, § 1557 fits neatly within the text of § 2000d-7.

*See* 29 U.S.C. § 623(a). In contrast, § 1557 unambiguously targets recipients of federal financial assistance. Hence, § 1557 falls squarely within the terms of § 2000d-7, whereas the ADEA provision does not. *See Sullivan*, 217 Fed. App'x at 395 (observing that the applicability of § 2000d-7 to a federal nondiscrimination provision turns on whether the provision targets "recipients of Federal financial assistance" (quoting 42 U.S.C. § 2000d-7(a)(1)).

As to the LSU Board's unreasoned suggestion that Congress intended the federal courts to essentially ignore the words "Federal financial assistance" in § 1557, the Court unequivocally rejects it. If Congress did not intend § 1557 to turn on the receipt of federal financial assistance, then all Congress had to do was delete those words from the statute. Yet Congress passed, and the President signed, those words into law. The Court is bound to honor their choice by giving those words their appropriate weight. *See United States v. Ramirez-Carcamo*, 559 F.3d 384, 387 (5th Cir. 2009) ("An important statutory construction principle is 'that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *TRW v. Andrews*, 534 U.S. 19, 31 (2001))).

The LSU Board also argues that "there can be no doubt that Congress is fully aware of how to draft an effective waiver of sovereign immunity, and there is also no doubt that Congress did not do so in drafting" § 1557.[37] The LSU Board seems confused: § 2000d-7 is an example of a valid waiver of state sovereign immunity, *see*

---

[37] R. Doc. No. 35, at 6.

*Pace*, 403 F.3d at 287, and the plain text of § 1557 fits within the four corners of that waiver. So yes, Congress does indeed know how to draft an effective waiver—and Congress did so with § 1557.

Despite the LSU Board's contention to the contrary, Congress did not "hide [any] elephants in mouseholes."[38] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). "[I]f the clear-statement requirement is met, the state is *conclusively* presumed to have 'known' that receipt of clearly conditioned federal funds requires the state to abide by the condition (i.e., waiver of Eleventh Amendment immunity)." *Pace*, 403 F.3d at 284 (emphasis added). The Fifth Circuit—sitting en banc, no less— upheld § 2000d-7 against a challenge by Louisiana in 2005, concluding that the provision provided just such a clear statement. *See Pace*, 403 F.3d at 280-87. The LSU Board should not be surprised, then, that §2000d-7 covers § 1557. After all, § 1557 is a federal nondiscrimination provision that bases coverage on the receipt of federal funds.

Lastly, the LSU Board contends that "Section 1557, by its own terms, only applies to health programs and activities under Title I of the [ACA] which, outside of the health insurance exchanges, provide no federal funds to the States." The LSU Board is patently incorrect. Unless Title 42 of the U.S. Code or an amendment to it provides otherwise, § 1557 applies to "*any* health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." 42 U.S.C. 18116(a) (emphasis added). It also applies to "any

---

[38] *Id.*

program or activity that is administered by an Executive Agency or any entity established under" Title 42. *Id.* There is no statutory basis for the proposition that § 1557 is as circumscribed as the LSU Board contends.[39]

The Court holds that § 2000d-7 applies to § 1557 of the ACA. As such, if "any part" of a state "health program or activity" is the recipient of "Federal financial assistance," then sovereign immunity will not bar a federal court from adjudicating a § 1557 claim of discrimination. 42 U.S.C. § 18116(a).[40]

## B.

The LSU Board also contends that Esparza has failed to state a § 504 claim against it.[41]

---

[39] Regulations promulgated by the Secretary of Health and Human Services to implement § 1557 likewise follow the provision's clear text and note that an entity covered by § 1557 includes "[a]n entity that operates a health program or activity, any part of which receives Federal financial assistance." 45 C.F.R. § 92.4 (eff. July 18, 2016).

[40] The LSU Board only argues that § 1557 cannot apply to states and their instrumentalities. *See* R. Doc. No. 27-1. It does not argue that Esparza's § 1557 claim against it falls outside the purview of § 1557—i.e., that her allegations do not concern a "health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Therefore, the latter argument is waived. *See Am. States Ins. Co. v. Bailey* ("*Bailey*"), 133 F.3d 363, 372 (5th Cir. 1998) ("Failure to provide any legal or factual analysis of an issue results in waiver."); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

[40] R. Doc. No. 27-1, at 6.

[41] *See* R. Doc. No. 27, at 6-7. The Court notes that the LSU Board's first motion to dismiss objected to Esparza's § 1557 claim on the ground that the LSU Board was not responsible for alleged discriminatory treatment that Esparza experienced. *See* R. Doc. No. 23-1. The Court dismissed the motion without prejudice and ordered the LSU Board to refile, incorporating discussion of particular issues identified by the Court. *See* R. Doc. No. 25. In its refiled motion, the LSU Board objects to Esparza's § 1557 claim on sovereign immunity grounds—but it does not raise the objection from

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Fifth Circuit has noted that "[t]he ADA and the Rehabilitation Act generally are interpreted *in pari materia*"—in English, the two statutes are similarly construed. *Frame*, 657 F.3d at 223; *see also In pari materia*, Black's Law Dictionary (8th ed. 2004) (explaining that *in pari materia* is a canon of construction whereby statutes on the same subject are construed together). As such, jurisprudence interpreting either Title II or § 504 is applicable to *both* Title II *and* § 504. *Hainze v. Richard*s, 207 F.3d 795, 799 (5th Cir. 2000).

In order for Esparza to state a § 504 claim against the LSU Board, Esparza must allege: "(1) that [she] has a qualifying disability; (2) that [she] is being denied the benefits of services, programs, or activities for which the [LSU Board] is responsible, or is otherwise discriminated against by the [LSU Board]; and (3) that such discrimination is [solely] by reason of [her] disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (Title II standard); *cf. Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 676 (5th Cir. 2004) (citing *Brown v. Sibley*, 650 F.2d 760, 769 (5th Cir. 1981)) (articulating the elements of a § 504 claim). Esparza must also allege that the LSU Board "receives or directly benefits from federal financial assistance."

---

its original motion. As such, the argument is waived. *See Bailey*, 133 F.3d at 372; *cf. Dunkel*, 927 F.2d at 956.

*Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 427 (5th Cir. 1997); *see also* 29 U.S.C. § 794(a).

The LSU Board argues that it is not "responsible" for any of the "services, programs, or activities" of which Esparza complains. *Hale*, 642 F.3d at 499. The LSU Board points to Esparza's allegations that the LSU Board owns the hospital, but then contracts with UMC to operate it.[42] According to the LSU Board, because Esparza's "allegations stem solely from an alleged failure to receive necessary services and not from any building access issues," LSU cannot be held responsible under § 504.[43]

The Court disagrees with the LSU Board. Longstanding federal regulations implementing § 504 provide that a recipient of federal financial assistance, "in providing any aid, benefit, or service, may not, directly or *through contractual, licensing, or other arrangements*, on the basis of handicap":

    (i)     Deny a qualified handicapped person the opportunity to
            participate in or benefit from the aid, benefit, or service;

    (ii)    Afford a qualified handicapped person an opportunity to
            participate in or benefit from the aid, benefit, or service that is
            not equal to that afforded others; [or]

    (iii)   Provide a qualified handicapped person with an aid, benefit, or
            service that is not as effective in affording equal opportunity to
            obtain the same result, to gain the same benefit, or to reach the
            same level of achievement as that provided to others.

---

[42] R. Doc. No. 27-1, at 6.
[43] *Id.*

28 C.F.R. § 41.51(b)(1)(i)-(iii) (emphasis added).[44] Critically, for purposes of the Court's analysis, federal regulations implementing Title II of the Americans with Disabilities Act (ADA) are identical in all material respects. *See* 28 C.F.R. § 35.130(b)(1)(i)-(iii) (implementing 42 U.S.C. § 12132); *see also Pace*, 403 F.3d at 288 ("The implementing regulations for § 504 and Title II are, in all material respects, the same."). This similarity is not surprising.

As the Court previously mentioned, Title II and § 504 are interpreted *in pari materia*. *Frame*, 657 F.3d at 223. As such, the Court considers administrative guidance concerning the meaning of the phrase "contractual, licensing, or other arrangements" in Title II regulations as indicative of the phrase's meaning in § 504 regulations. (The parties do not question the validity of these regulations and so neither will the Court. *Cf. Olmstead v. Zimring*, 527 U.S. 581, 592 (1999) (declining to determine the validity of federal regulations where the issue is not raised by the parties). Indeed, the LSU Board does not discuss, or even acknowledge, these regulations.[45])

With respect to the phrase "contractual, licensing, or other arrangements" as used in Title II regulations, guidance published by the U.S. Department of Justice

---

[44] The Section 504 regulations at issue were first promulgated in 1978. *See* Coordination of Federal Agency Enforcement of Section 504 of the Rehabilitation Act of 1973, 43 Fed. Reg. 2132 (Jan. 13, 1978).

[45] *See* R. Doc. No. 27-1, at 6.

("DOJ")[46] that addresses private correctional facilities operating as state facilities pursuant to state contract is both instructive and persuasive:

> As the [DOJ] stated in the preamble to the original title II regulation, "[a]ll governmental activities of public entities are covered, even if they are carried out by contractors." 28 CFR part 35, app. A at 558 (2009). If a prison is occupied by State prisoners and is inaccessible, the State is responsible under title II of the ADA. The same is true for a county or city jail. In essence, the private builder or contractor that operates the correctional facility does so at the direction of the government entity. Moreover, even if the State enters into a contractual, licensing, or other arrangement for correctional services with a public entity that has its own title II obligations, the State is still responsible for ensuring that the other public entity complies with title II in providing these services.

Appendix to Part 35—Guidance to Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services. 28 C.F.R. pt. 35, app. A (eff. Mar. 15, 2011) (alternation in original). In other words, DOJ's guidance indicates that a state entity cannot escape its obligations under Title II by contracting out the services for which it is ultimately responsible. *See, e.g.*, *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1066 (9th Cir. 2010) ("That a public entity has contracted for the provision or occurrence of such services, programs and activities seems sufficient to make them 'the services, programs, or activities' of that entity" under Title II.); *Phillips v. Tiona*, 508 Fed. App'x 737, 753 (10th Cir. 2013) (discussing *Armstrong*'s analysis of a state's "contract obligations" under Title II with approval); *Kerr v. Heather Gardens Ass'n*, No. 09-409, 2010 WL 3791484, at *11 (D.

---

[46] The Attorney General has the responsibility to implement Title II via appropriate regulations. 42 U.S.C. § 12134(a); *see also Hainze*, 207 F.3d at 799 (noting that Title II "directs the Attorney General to promulgate regulations to effectuate the statute's purpose").

Colo. Sept. 22, 2010) (Krieger, J.) ("[A] public entity, who contracts with another entity to perform its duties, remains liable to ensure that the other entity performs those duties in compliance with Title II.").  The same logic would apply with equal force to § 504.  *See Frame*, 657 F.3d at 223.

DOJ's Title II Technical Assistance Manual ("Manual") further illustrates this view.  (The U.S. Supreme Court has looked to DOJ's Manuals for guidance in the Title III context.  *See Bragdon v. Abbott*, 524 U.S. 624, 646 (1998)).  Describing Title II's relationship to Title III, the Manual provides the following two examples:

> A privately owned restaurant in a State park operates for the convenience of park users under a concession agreement with a State department of parks.  As a public accommodation, the restaurant is subject to title III and must meet those obligations.  The State department of parks, a public entity, is subject to title II.  *The parks department is obligated to ensure by contract that the restaurant is operated in a manner that enables the parks department to meet its title II obligations, even though the restaurant is not directly subject to title II.*
>
> . . .
>
> A private, nonprofit corporation operates a number of group homes under contract with a State agency for the benefit of individuals with mental disabilities.  These particular homes provide a significant enough level of social services to be considered places of public accommodation under title III.  *The State agency must ensure that its contracts are carried out in accordance with title II*, and the private entity must ensure that the homes comply with title III.

U.S. Dep't of Justice, Title II Technical Assistance Manual: Covering State and Local Government Programs and Services, The Americans with Disabilities Act, https://www.ada.gov/taman2.html#II-1.1000 (last visited August 29, 2017) (emphasis added).  Adapting these examples to fit the § 504 context, where one entity that is

subject to § 504 enters into a contractual or agency relationship with another entity, the first entity may be held "responsible" for the other entity's violations of § 504. *Cf. Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 873 (9th Cir. 2004) (noting that Title III regulations used the phrase "contractual, licensing, or other arrangements" and concluding that "[t]hese provisions make clear that private entities otherwise covered by Title III may not avoid their obligations through contract").

In this case, Esparza alleges that the LSU Board and UMC are parties to a contractual relationship whereby UMC operates the hospital on behalf of the LSU Board.[47] More specifically, Esparza alleges that the LSU Board *owns* the hospital[48] and that UMC carries out healthcare services that the "LSU [Board] has the legal authority to provide."[49] These factual allegations are sufficient to show the LSU Board may be responsible for Esparza's alleged discrimination "through contractual, licensing, or other arrangements" in violation of § 504. 28 C.F.R. § 41.51(b)(1).

## IV.

### A.

UMC and LCMC move to dismiss as premature Esparza's claims against them under the Louisiana Commission on Human Rights Act. According to UMC and LCMC, the allegations underlying Esparza's Louisiana Commission of Human Right

---

[47] R. Doc. No. 17, ¶¶ 10-12.
[48] In its briefing, the LSU Board does not contest Esparza's factual allegations concerning the relationship between the LSU Board and its co-defendants. *See* R. Doc. No. 27-1; R. Doc. No. 35.
[49] R. Doc. No. 17, ¶ 12.

Act claims against them "sound in medical malpractice."[50]  Therefore, the claims fall

within the purview of the Louisiana Medical Malpractice Act ("LMMA"), which

requires a plaintiff to submit medical malpractice claims to a medical review panel

for review prior to filing suit.[51]

### i.

"An action is premature when it is brought before the right to enforce it has

accrued." *Alonso v. Tulane Univ. Med. Ctr.*, 215 So. 3d 355, 357 (La. Ct. App. 5th Cir.

2016).  "[T]he exception of prematurity neither challenges nor attempts to defeat the

elements of the plaintiff's cause of action; instead, the defendant asserts the plaintiff

has failed to take some preliminary step necessary to make the controversy ripe for

judicial involvement." *LaCoste v. Pendleton Methodist Hosp., L.L.C.*, 966 So. 2d 519,

523 (La. 2007).

Under the LMMA, "[a]ll malpractice claims against health care providers . . .,

other than claims validly agreed for submission to a lawfully binding arbitration

procedure, shall be reviewed by a medical review panel."  La. R.S. § 40:1231.8(A)(1)(a).

The LMMA provides that "[n]o action against a health care provider . . ., or his insurer,

may be commenced in any court *before* the claimant's proposed complaint has been

presented to a medical review panel."[52]  *Id.* § 40:1231.8(B)(1)(a)(i).  "The Supreme

Court of Louisiana has interpreted this provision to not only require the plaintiff to

---

[50] R. Doc. No. 28-1, at 12.

[51] *See id.* at 10.

[52] The medical review panel requirement is subject to waiver by agreement of the parties.  La. R.S. § 1231.8(B)(1)(c).  Here, the defendants have not agreed to such a waiver.

*present* the claim to a medical review panel, but also to wait until 'the panel has *rendered its expert opinion* on the merits of the complaint' before filing suit." *Flagg v. Stryker Corp.*, 819 F.3d 132, 137-38 (5th Cir. 2016) (quoting *Delcambre v. Blood Sys., Inc.*, 893 So. 2d 23, 27 (La. 2005)) (emphasis in original). Federal courts adjudicating Louisiana law claims recognize and enforce the LMMA's procedural prerequisite to suit. *See, e.g.*, *Taylor v. Ochsner Clinic Foundation*, No. 11-1926, 11-2221, 2011 WL 6140885 (E.D. La. Dec. 9, 2011) (Vance, J.).

The LMMA defines "malpractice" as:

> any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions during the procurement of blood or blood components, in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs, and medicines, or from defects in or failures of prosthetic devices implanted in or used on or in the person of a patient.

La. R.S. § 40:1231.1(A)(13). The LMMA then defines "tort" as "any breach of duty or any negligent act or omission proximately causing injury or damage to another." *Id.* § 40:1231.1(A)(22).

To assist courts in determining whether a claim sounds in medical malpractice, the Louisiana Supreme Court has articulated six factors to guide the analysis:

> (1) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill;
>
> (2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached;

28

(3) whether the pertinent act or omission involved assessment of the patient's condition;

(4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform;

(5) whether the injury would have occurred if the patient had not sought treatment; and

(6) whether the tort alleged was intentional.

*LaCoste v. Pendleton Methodist Hosp., L.L.C.*, 966 So. 2d 519, 524 (La. 2007) (citing *Coleman v. Deno*, 813 So. 2d 303, 315-16 (La. 2002)).

A health care provider bears the burden of "show[ing] that it is entitled to a medical review panel because the allegations fall within the LMMA." *Id.* at 523-24; *see also Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 888 So. 2d 782, 785 (La. 2004). If a health care provider satisfies its burden, then a court must dismiss the claim. *See Dading*, 2005 WL 2037450, at *7.

**ii.**

First off, the Court must address UMC and LCMC's argument that "the fact that [Esparza] may have made allegations sounding in both medical malpractice and general tort law does not remove her petition from the 'penumbra' of the LMMA, if a claim for medical malpractice is stated."[53] UMC and LCMC seem to suggest that the Court should dismiss Esparza's complaint as premature if, when reading *all* of

---

[53] R. Doc. No. 28-1, at 10 (quoting *Rivera v. Bolden's Transp. Serv., Inc.*, 97 So. 3d 1096, 1100 (La. Ct. App. 1st Cir. 2012)).

Esparza's allegations, the Court can discern a *potential* medical malpractice claim. The Court rejects this approach.

The Court is bound to follow the Louisiana Supreme Court on questions of Louisiana law. *See In re Katrina Canal Breaches Liti.*, 495 F.3d 191, 206 (5th Cir. 2007). When considering whether a plaintiff's allegations sound in medical malpractice, the Louisiana Supreme Court has not assumed the identity of Sherlock Holmes on the scene of a crime, examining every factual allegation in a complaint to see if any one of them involves medical malpractice. Rather, the Louisiana Supreme Court has focused squarely on what the plaintiff has alleged that the hospital or doctor did wrong: failing to repair a wheelchair, *Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 888 So. 2d 782, 789 (La. 2004); "[f]ailing to keep the patient's bed in the lowest position with the wheels locked," *Blevins v. Hamilton Med. Ctr., Inc.*, 959 So. 2d 440, 442 (La. 2007); [f]ailing to properly instruct the patient on proper use of and safety with regard to his bed," *id.* at 443. *Cf. Dupuy v. NMC Operating Co., L.L.C.*, 187 So. 3d 436, 440 (La. 2016) ("We find that the allegation at issue here, that the Hospital failed to properly maintain and service the equipment utilized in the sterilization process, including, but not limited to, the washers and sterilizers used to sterilize the equipment used in [the plaintiff's] surgery, is 'treatment related.'").

A focus on the particular wrong or wrongs alleged by a plaintiff comports well with the Louisiana Supreme Court's jurisprudence interpreting and applying the LMMA. After all, that court's six-factor test to guide determinations of whether a claim sounds in medical malpractice focuses squarely on the alleged "particular

wrong." *LaCoste*, 966 So. 2d at 524. Moreover, the Louisiana Supreme Court "has steadfastly emphasized that the LMMA and its limitations on tort liability for a qualified health care provider apply *only* to claims 'arising from medical malpractice.'" *Id*. "Because the [LMMA]'s limitations on the liability of health care providers are in derogation of the rights of tort victims, the [LMMA] is to be strictly construed." *Dupuy*, 187 So. 3d at 439. "[A]ny ambiguity should be resolved in favor of the plaintiff and against finding that the tort alleged sounds in medical malpractice." *LaCoste*, 966 So. 2d at 524.

Accordingly, this Court will focus on the specific wrong alleged by Esparza: the hospital's failure to provide her with a qualified in-person sign language interpreter in violation of federal and Louisiana nondiscrimination law.

### iii.

The Court concludes that this alleged wrong falls outside the purview of the LMMA. As far as the Court is aware, neither the Louisiana Supreme Court nor any of Louisiana's circuit courts of appeal have applied the LMMA to discrimination claims such as Esparza's. This state of affairs is not particularly surprising: Louisiana courts seem to distinguish between *tort* claims[54] on the one hand and

---

[54] The "fountainhead of tort liability" in Louisiana law is La. Civ. C. art. 2315. *Spradlin v. Acadia-St. Landry Med. Foundation*, 758 So. 2d 116, 121 n.8 (La. 2000). Article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. C. art. 2315(A). The Louisiana Supreme Court has declined to address "whether there is a cause of action for damages under" article 2315 "based on the violation of a statutory law designed to protect the injured person's interest" where the statute does not itself contain an express private cause of action. *Spradlin*, 758 So. 2d at 121 n.8.

*discrimination* claims on the other. *See Cox v. Glazer Steel Corp.*, 606 So. 2d 518, 518 (La. 1992) (treating a disability discrimination claim brought pursuant to a Louisiana nondiscrimination statute as distinct from a tort claim); *Riser v. H.Y. Bell Mem'l Apartments*, 669 So. 2d 689, 692 (Ct. App. La. 2d Cir. 1996) ("[The plaintiff] cannot recover [in tort] because there was no allegation or evidence of an act or omission attributable to [the defendant] which was a cause in fact of her injury independent of the discrimination claim.").[55] If discrimination is not a tort under the LMMA, *see* La. R.S. § 40:1231.1(A)(22) (defining "tort" as used in the LMMA), then Esparza is not subject to the LMMA's procedural requirements, *see id.* § 40:1231.1(A)(13) (applying the LMMA to unintentional torts and breaches of contract).

The conclusion that Esparza's alleged wrong is not subject to the LMMA is buttressed by an examination of the Louisiana Supreme Court's six-factor test for determining whether a given allegation is covered by the LMMA. *See LaCoste*, 966 So. 2d at 524 (listing the six factors). This test is designed to identify wrongs resulting

---

[55] The Court notes that, in two cases in the 1980s, the U.S. Court of Appeals for the Fifth Circuit characterized discrimination claims under Louisiana labor and workers' compensation law as torts for purposes of the applicable prescriptive period. *See Jay v. Int'l Salt Co.*, 868 F.2d 179, 180 (5th Cir. 1989) (concluding that an age discrimination claim is a tort for purposes of prescription); *Williams v. Conoco, Inc.*, 860 F.2d 1306, 1307 (5th Cir. 1988) (same for a racial discrimination claim); *cf. Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (Posner, J.) ("Discrimination is an intentional tort . . . ."). However, the *Williams* panel did not explain the basis for its characterization. *See* 860 F.2d at 1307. The *Jay* panel simply followed the *Williams* panel. *See* 868 F.2d at 180. Ultimately, the Louisiana Supreme Court endorsed the Fifth Circuit's conclusion that the prescriptive period applicable to torts also applies to discrimination claims, but—notably—the Louisiana Supreme Court did not itself characterize discrimination claims as tort claims in the process. *See King v. Phelps Dunbar, L.L.P.*, 743 So. 2d 181, 187 (La. 1999).

from "*treatment*-related *medical* decisions"—wrongs that "*directly* relate to the *treatment* of [a] given patient." *Billeaudeau v. Opelousas Gen. Hosp. Auth.*, 218 So. 3d 513, 523 (La. 2016) (emphasis added). In other words, the factors focus a court's inquiry on why a patient pursued medical care in the first place: what maladies inflicted her and what medical treatment did she receive to alleviate those maladies (as well as any additional medical issues that arose during treatment). Where the alleged wrong is not *directly* related to *that* treatment, then the wrong is not subject to the LMMA.

In this case, Esparza does not explicitly complain about the medical care that she received from the hospital. Rather, she complains that the hospital violated federal and Louisiana nondiscrimination law by failing to provide her with an adequate accommodation for her deafness. This alleged wrong is not directly related to the hospital's treatment of Esparza's broken arm or dental issues, or to the processing of her lab work—the reasons that she sought the hospital's services.

UMC and LCMC contend that "[t]here is no question" that Esparza's Louisiana Commission on Human Rights Act claims sound in medical malpractice and therefore fall within the purview of the LMMA.[56] In support of their argument, UMC and LCMC point to a recent decision by Judge Barbier, who dismissed as premature allegedly similar claims brought under the Louisiana Commission on Human Rights Act. *See Bernius v. Ochsner Med. Ctr. – North Shore, L.L.C.*, No. 16-14730, R. Doc. No. 33, at 20-21 (E.D. La. Dec. 15, 2016) (Barbier, J.). However, the *Bernius* plaintiffs

---

[56] R. Doc. No. 28-1, at 12.

admitted to Judge Barbier that they had filed a complaint with a medical review board and so Judge Barbier dismissed the claims based on that admission alone. *Id.* at 20-21. Judge Barbier did not himself analyze the plaintiffs' claims to determine whether they fell within the purview of the LMMA.

In the end, UMC and LCMC ask this Court to hold that any discrimination experienced in the process of receiving medical treatment converts a Louisiana law claim challenging that discrimination into medical malpractice under the LMMA. Yet this interpretation of the LMMA's reach "would be very broadly applied which is contrary to the proper strict interpretation we are bound to give" the LMMA. *Blevins v. Hamilton Med. Ctr., Inc.*, 959 So. 2d 440, 446 (La. 2007). The Court concludes that the Louisiana Supreme Court would not stretch the LMMA in this new direction. That conclusion is determinative. *See In re Katrina Canal Breaches Liti.*, 495 F.3d at 206 ("In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case.").

Esparza's Louisiana Commission of Human Rights Act claims are not premature. Therefore, the Court need not address UMC and LCMC's request to stay Esparza's federal law claims, which is premised on dismissal of the Louisiana Commission of Human Rights claims.

## B.

Lastly, UMC and LCMC argue that Esparza's claims for compensatory damages under § 504 and § 1557 should be dismissed on the ground that Esparza

does not allege intentional discrimination.[57]  Esparza counters that she has pleaded factual allegations supporting a finding of intentional discrimination.[58]

### i.

"A plaintiff asserting a private cause of action for violations of [§ 504] may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle v. Victoria Cnty., Tex*, 302 F.3d 567, 574 (5th Cir. 2002).  The parties agree that compensatory damages should also be available to a plaintiff bringing a § 1557 claim based on intentional discrimination.[59]

Congress explicitly references and incorporates the "enforcement mechanisms" under § 504 and the three other federal nondiscrimination statutes into § 1557.  42 U.S.C. § 18116(a).  As § 504 permits compensatory damages as an enforcement mechanism in instances of intentional discrimination on the basis of disability, § 1557 permits the same *at least* where the violation of § 1557 is premised on allegations of disability discrimination—the protected class defined by reference to § 504.[60]  The

---

[57] *See* R. Doc. No. 28-1, at 21-25.

[58] *See* R. Doc. No. 32, at 15-21.

[59] *See* R. Doc. No. 28-1, at 22; R. Doc. No. 32, at 15.

[60] Section 504 is not the only statute referenced in and incorporated into § 1557.  *See* 42 U.S.C. § 18116(a).  In total, § 1557 references and incorporated four separate federal statutes, each of which protects a different class of individuals.  *See id.*  One court has concluded that "Congress's express incorporation of the enforcement mechanisms from those four federal civil rights statutes, as well as its decision to define the protected classes by reference thereto, manifests an intent to import the various different standards and burdens of proof into a Section 1557 claim, depending upon the protected class at issue."  *Se. Penn. Trans. Auth.*, 102 F. Supp. 3d at 698-99.  Similarly, in recognizing that jurisprudence interpreting either Title II or § 504 is equally applicable to the other, the Fifth Circuit observed that Congress explicitly incorporated "[t]he remedies, procedures and rights" available under § 504 into Title II.  *Hainze*, 207 F.3d at 799 (quoting 42 U.S.C. § 12133).

Court need not decide more at this time. In short, to recover compensatory damages under § 504 and § 1557, Esparza's factual allegations must support a finding of intentional discrimination. *Delano-Pyle*, 302 F.3d at 574.

### ii.

The parties also argue over whether intentional discrimination requires a showing of "discriminatory animus."[61] In *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 Fed. App'x 180 (5th Cir. 2015) (per curiam), the Fifth Circuit noted that "[w]e did not define what we meant by intent in" *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567 (5th Cir. 2002).[62] 624 Fed. App'x at 184. However, the *Delano-Pyle* panel— in noting that a showing of intentional discrimination was required to recover compensatory damages under § 504—cites to *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d 261 (5th Cir. 1984). 302 F.3d at 575. In *Carter*, the Fifth Circuit implies some distance between an "intentional" violation of § 504 and one "manifest[ing] some discriminatory animus." 725 F.2d at 264; *see also id.* ("[The plaintiff] has never alleged that the School Board intended to place his children in inappropriate classes or that his children's placement manifested discriminatory animus.").

---

[61] *See* R. Doc. No. 28-1, at 23; R. Doc. No. 32, at 16.

[62] Some courts have read *Delano-Pyle* as rejecting deliberate indifference as an appropriate standard for recovering compensatory damages under § 504. *See Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3rd Cir. 2013). However, at least one panel of the Fifth Circuit has not read *Delano-Pyle* to categorically reject this standard. *See Perez*, 624 Fed. App'x at 184; *see also Delano-Pyle*, 302 F.3d at 575 ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the [Rehabilitation Act]. However, in order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination.").

To the Court, such distance makes sense. One can intentionally violate a nondiscrimination law without possessing animus toward the class of people that the law protects. For example, one might decide that compliance with the law is simply too expensive. In such a case, money—not malice—is motivating the violation. *Cf. Alexander v. Choate*, 469 U.S. 287, 295 (1985) ("Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect."). The discrimination that results is still intentional in the sense of being "purposeful[ ]," but it does not arise from animus. *Perez*, 624 Fed. App'x at 184.

UMC and LCMC correctly point out that the Fifth Circuit in *Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375 (5th Cir. 2016) required "evidence of malice, ill-will or efforts . . . to impede the disabled student's progress" in order to recover compensatory damages under § 504. 842 F.3d at 380 (quoting *McGregor v. La. St. Univ. Bd. of Super.*, 3 F.3d 850, 859 (5th Cir. 1993)) (internal quotation marks omitted).[63] However, the *Campbell* panel recognized that the case concerned a unique issue: a "university's academic decision not to alter its program" to accommodate a disabled student, to which a court "must defer." 842 F.3d at 380; *see also McGregor*, 3 F.3d at 859 (same).

Beyond the context of a § 504 challenge to a university program's design, the Fifth Circuit has not required evidence of malice or ill-will to recover compensatory damages. *See Perez*, 624 Fed. App'x at 185-86; *Delano-Pyle*, 302 F.3d at 574-76; *cf.,*

---

[63] *Campbell* incorrectly credits *Delano-Pyle* as the source of the quoted material.

*e.g.*, *Bartlett v. N.Y. St. Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998) ("In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will."), *vacated on other grounds*, 527 U.S. 1031 (1999); *Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) ("Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person . . . ."); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (adopting the deliberate indifference as the standard to recover compensatory damages under § 504 and observing that this standard does not require a showing of discriminatory intent); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012) (applying the deliberate indifference standard in the § 504 context and observing that "[t]he legislative history of the [Rehabilitation Act] [ ] shows that Congress intended for § 504 to combat intentional discrimination in general, not just discrimination resulting from 'invidious animus'" (quoting *Alexander*, 469 U.S. at 295)). Taking its cue from the Fifth Circuit, this Court will not require Esparza to show discriminatory animus on the part of UMC and LCMC in order to recover compensatory damages under either § 504 or § 1557.

The Court concludes that Esparza's factual allegations show that UMC and LCMC intentionally—as in "purposefully"—discriminated against her.[64] *Perez*, 624

---

[64] Esparza asks the Court to hold that a showing of "deliberate indifference" satisfies a plaintiff's burden of proving intentional discrimination for purposes of recovering compensatory damages from UMC and LCMC under § 504 and § 1557. *See* R. Doc. No. 32, at 16-18. However, because the factual allegations show that UMC and LCMC "purposefully" discriminated against Esparza, *Perez*, 624 Fed. App'x at 184, the Court need not decide at this time whether a defendant's deliberate indifference constitutes intentional discrimination in this context, *see id.* (declining to decide

Fed. App'x at 184. Esparza "indicat[es] that on several occasions, an interpreter was requested but not provided." *Id.* at 185. "There is also evidence indicating that one of the forms of communication that [the hospital] was utilizing, the VRI machines, was often ineffective." *Id.* The allegations show that Esparza "made repeated requests for auxiliary aids, yet [hospital staff] failed on several occasions to provide effective aids and . . . refused to provide an interpreter after one had been requested." *Id.* at 185-86.

Accepting the factual allegations in the complaint as true and construing them in the light most favorable to Esparza, Esparza has stated claims for compensatory damages under § 504 and § 1557.

**V.**

Accordingly,

**IT IS ORDERED** that the motions are **DENIED**.

New Orleans, Louisiana, September 5, 2017.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

whether deliberate indifference is sufficient to recover compensatory damages under § 504 where the facts support a finding of "purposeful[ ]" discrimination).